UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

ROBERT EVANS,

          Plaintiff,

    v.                                 CAUSE NO. 3:23cv822 DRL

WHITE *et al.*,

          Defendants.

OPINION AND ORDER

Robert Evans, a prisoner without a lawyer, is proceeding in this case on four claims. First, he is proceeding against Investigations and Intelligence (I&I) Analyst Brittney White and I&I Analyst Joseph Takacs "in their personal capacity for monetary damages for allegedly confiscating his correspondence in November 2022, December 2022, and January 2023 without a valid security justification in violation of the First Amendment[.]" ECF 16 at 6. Second, he is proceeding against Grievance Specialist Joshua Wallen "in his personal capacity for monetary damages for allegedly denying him due process protections in connection with the confiscation of his correspondence[.]" *Id.* Third, he is proceeding against I&I Analyst White, I&I Analyst Takacs, and Grievance Specialist Wallen "in their personal capacity for monetary damages for allegedly retaliating against him in violation of the First Amendment for filing a prior lawsuit[.]" *Id.* Fourth, he is proceeding "against Warden Ron Neal in his personal capacity for monetary damages for allegedly approving of retaliatory conduct by his subordinates in violation of the First Amendment[.]" *Id.* The defendants filed a summary judgment motion. Mr. Evans filed a response, and the defendants filed a reply.

Mr. Evans also filed a cross-motion for summary judgment. The defendants filed a response, and Mr. Evans declined a reply. The summary judgment motions are ripe for ruling.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable [factfinder] could [find] for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). This standard does not change when parties file cross-motions for summary judgment. *International Brotherhood of Electrical Workers, Local 176* v. *Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002). "When considering the plaintiffs' motion for summary judgment, the court must consider the evidence in the light reasonably most favorable to the defendants, and vice versa." *Eaton v. Onan Corp.*, 117 F. Supp. 2d 812, 818 (S. D. Ind. 2000); *see also O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001) ("With crossmotions, our review of the record requires that we construe all inferences in favor of the party against whom the motion under consideration is made.") (citation omitted). A party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in its own pleading but must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010).

A. *First Amendment Confiscation-of-Mail Claim.*

Prisoners have a protected First Amendment interest in their incoming and outgoing mail. *Van den Bosch v. Raemisch*, 658 F.3d 778, 785–786 (7th Cir. 2011); *see also Rowe v. Shake*, 196 F.3d 778, 782 (7th Cir. 1999). A court must consider two factors when deciding whether the withholding of an inmate's mail violates the First Amendment. *Koutnik v. Brown*, 456 F.3d 777, 784 (7th Cir. 2006). "First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression." *Id*. (citation omitted). Such interests include "security, order, and rehabilitation." *Id*. (citation omitted); *see also Thornburgh v. Abbott*, 490 U.S. 401, 412 (1989) (observing that "[d]angerous outgoing correspondence" includes "escape plans, plans relating to ongoing criminal activity, and threats of blackmail or extortion"). Second, the challenged action "must be no greater than is necessary or essential to the protection of that interest." *Koutnik*, 456 F.3d at 784 (citation and quotations omitted); *see also Rios v. Lane*, 812 F.2d 1032, 1037 (7th Cir. 1987) ("The more difficult task however, is not in identifying an important governmental interest at stake, rather it is in determining whether the enforcement of [the rule] was no greater an infringement upon [the plaintiff's] first amendment liberties than [was] necessary to protect the state's interest.").

The parties provide evidence of the following facts. During all relevant times, the Indiana Department of Correction (IDOC) had policies in place to establish a mechanism for inmates to maintain contact with persons in the community through correspondence, printed material, and emails in a manner that ensured the safety and security of the persons and facilities involved. ECF 147-2 at 1-2. This includes a Correspondence Policy, Telephones

3

Policy, and Tablets and Kiosks Facility Directive. *Id.* Pursuant to these policies, Mr. Evans and other inmates at ISP were generally able to communicate with other individuals via telephone, written correspondence, and the Global Tel Link (GTL) system for email and video communications. *Id.* at 2. The ability to communicate with individuals via telephone, written correspondence, and emails was a privilege that could be temporarily and permanently suspended for rule violations and other disciplinary reasons. *Id.* at 4.

Pursuant to these policies, all correspondence, including all incoming and outgoing correspondence and emails using the GTL system, were monitored by ISP staff, who could mark incoming and outgoing correspondence to be censored, withheld, or confiscated for policy violations. ECF 147-2 at 2. ISP policy establishes the following process for monitoring and inspecting an inmates' outgoing correspondence: (1) all incoming and outgoing correspondence shall be reviewed by staff prior to the correspondence being released to the appropriate party; (2) if staff revokes or withholds any correspondence for violating any ISP policy, a notice is generated to the inmate indicating the correspondence was withheld and providing a brief explanation; (3) upon notice that a correspondence has been withheld or revoked, the inmate can file a grievance challenging the withholding or revocation; and (4) if the correspondence is found to be legitimately confiscated or excluded, it is discarded by staff. *Id.* at 4-6.

Pursuant to the Correspondence Policy, inmates are required to obtain prior approval to receive or send correspondence to another person if the other person is an inmate in a correctional facility, on parole, or released from a correctional facility to county probation supervision. ECF 147-2 at 21. The burden of obtaining permission for such correspondence

is on the inmate. *Id.* Inmates are also prohibited from using a mail forwarding service, using other individuals to forward their correspondence, and using third-party mailings to circumvent the requirements of incoming and outgoing correspondence. *Id.* at 3, 31. Additionally, the Correspondence Policy lists as "prohibited property" any printed matters or emails that threaten the security of the public, facility, or program, including any materials that are written in code, encourage the commission of criminal activity, or depict or describe any activities which may lead to physical violence or group disruptions, including gang signs. *Id.* at 3, 40. The Tablets and Kiosks Facility Directive also prohibits inmates from using the GTL system in a way that violates the "Offender Visitation" policy, and expressly restricts inmates from receiving photographs or emails which make sexual gestures of any kind or include any individual who is "improperly dressed." *Id.* at 12-13, 48.

Pursuant to the Tablets and Kiosks Facility Directive, any individual wishing to communicate with an inmate must first establish a GTL account. ECF 147-2 at 3. GTL's "Terms of Use" prohibit a user from using a user ID or account of another user or attempting to impersonate another user. *Id.* at 3-4. This activity was also prohibited by IDOC policies, as it represented a safety and security threat to the facility and could be reasonably interpreted as an attempt to circumvent the requirements and restrictions on incoming and outgoing correspondence. *Id.* at 4. Because neither party disputes these facts, the court accepts them as undisputed.

I&I Analyst White and I&I Analyst Takacs argue summary judgment is warranted in their favor because IDOC's policies are constitutional and were properly implemented by withholding each of Mr. Evans' emails. ECF 149 at 4-19. In his response and cross-motion,

Mr. Evans does not dispute that the IDOC policies at issue in this case are constitutional. ECF 151-1, 157-1 at 17 ("There is no dispute that the IDOC policy on correspondence has been reviewed and 'upheld' to be reasonably related to legitimate penological interests by courts on numerous occasions."). Instead, he argues the defendants unreasonably interpreted ISP's policies by withholding and censoring his emails. ECF 151-1 at 8-9; ECF 157-1 at 4, 11, 17. Mr. Evans proceeds against I&I Analyst Takacs and I&I Analyst White for withholding four categories of emails. Each category is addressed in turn.

1. *November 22 Email.*

On November 22, 2022, Mr. Evans sent an email to Michael Freed, his biological brother who had been incarcerated but was released on parole. ECF 147-2 at 6-7, 56. The subject line of this email was "RE: Love Brother," and the content attempted to provide Mr. Freed with the telephone number of "Floyd," who Mr. Evans claims is a reference to his father-in-law Floyd Idle. ECF 52-1 at 138; ECF 147-2 at 6-7, 56. ISP staff processed the November 22 email and censored the telephone number before sending it to Mr. Freed. ECF 147-2 at 7. Mr. Evans filed Grievance 148231, claiming the telephone number was improperly censored. ECF 52-1 at 138.

In investigating the grievance, Grievance Specialist Wallen contacted I&I Analysts White and Takacs regarding the rationale for censoring the telephone number. ECF 52-1 at 152. I&I Analyst Takacs informed Grievance Specialist Wallen the telephone number was likely a "phony" because it appeared on different inmates' PAN lists under different names, and that Mr. Freed and Mr. Evans were in violation of the Correspondence Policy because Mr. Freed was on parole such that he was not able to communicate with Mr. Evans without

prior approval. *Id.* at 151-52; ECF 139-3 at 5. Grievance Specialist Wallen then denied Grievance 148231, concluding there was a policy violation and the email was properly censored. ECF 52-1 at 139; ECF 147-4 at 6. Mr. Evans fully appealed Grievance Specialist Wallen's response to the Warden and the Department Grievance Manager, and both appeals were denied. ECF 52-1 at 148.

I&I Analyst Takacs and I&I Analyst White both attest the November 22 email was properly censored for violating IDOC policies as a threat to the safety and security of the facility because it (1) can be reasonably interpreted as an attempt by Mr. Evans to make contact through a third party, and (2) represents an unauthorized communication between a current inmate and a parolee, without prior authorization to do so. ECF 147-2 at 7; ECF 147-3 at 6. Warden Neal attests that, pursuant to the Correspondence Policy, Mr. Evans was required to obtain approval from the Department to send or receive correspondence to Mr. Freed because Mr. Freed was on parole. ECF 147-1 at 4. This is true even if Mr. Evans and Mr. Freed had prior approval to communicate with one another while they were both incarcerated at ISP, as Mr. Evans was required to obtain new approval to communicate with Mr. Freed once Mr. Freed was released on parole. *Id.*

Mr. Evans argues the censoring of this phone number violated IDOC policy because he had prior approval to correspond with Mr. Freed at ISP. ECF 157-1 at 14-17. In support of this assertion, he cites "ECF 53 at 2," which refers to an exhibit showing Mr. Evans was granted permission to communicate with Mr. Freed in 2014. ECF 51-1 at 1; ECF 53 at 2. But Warden Neal attests that, even assuming Mr. Evans had permission to communicate with Mr. Freed while they both were incarcerated, Mr. Evans needed to obtain permission to

7

continue communicating with Mr. Freed once Mr. Freed was released on parole. ECF 147-1 at 4. Mr. Evans does not dispute this attestation, and does not argue or provide any evidence he received permission to continue communicating with Mr. Freed once Mr. Freed was released on parole. Therefore, the undisputed facts show the defendants properly applied the Correspondence Policy by censoring this email, as the policy provides that Mr. Evans needed to obtain prior approval from the Department before he could communicate with Mr. Freed once Mr. Freed was released on parole. *See* ECF 147-2 at 21. Moreover, the inclusion of the phone number in this email can be reasonably interpreted to violate the Correspondence Policy's prohibition on using other individuals to forward their correspondence to circumvent the requirements of incoming and outgoing correspondence. *See id.* at 31. Enforcement of the rule was not a greater infringement upon Mr. Evans' First Amendment rights than was necessary to protect their legitimate interests in the safety and security of the prison facility and Mr. Evans' rehabilitation. *See Koutnik*, 456 F.3d at 784.

   2. *December 13 Emails.*

On December 13, 2022, Mr. Evans attempted to send an email to "Michael Jones" with the subject "Hey!!" ECF 147-2 at 8, 57. In the content of the message, Mr. Evans stated "Hey bro I still need haileys address!" and stated "I need ur new number too!" *Id.* This email was revoked by IDOC, though the record does not indicate who made the decision to revoke the email. *Id.* Mr. Evans challenged the revocation of this email in Grievance 149812. ECF 147-4 at 8; ECF 52-1 at 160. While investigating the grievance, I&I Analyst Takacs informed Grievance Specialist Wallen that "Michael Jones" is a pseudonym for Mr. Evans' brother Mr. Freed, and that Mr. Freed and Mr. Evans were in violation of the Correspondence Policy

because Mr. Freed was on parole and they did not have permission to communicate. ECF 52-1 at 168. Grievance Specialist Wallen denied Grievance 149812 on this basis. ECF 52-1 at 161; ECF 147-4 at 9. Mr. Evans appealed the Grievance Specialist's denial of Grievance 149812 to the Warden, and the Warden agreed with Grievance Specialist Wallen's response. ECF 52-1 at 166; ECF 147-4 at 9. I&I Analyst Takacs and I&I Analyst White attest the December 13 email was properly censored because (1) Mr. Evans and Mr. Freed were not allowed to communicate with one another without prior permission because Mr. Freed was on parole, and (2) the use of a pseudonym for Mr. Freed violated policy and represented a safety and security risk to the facility and could be reasonably interpreted as an attempt to circumvent the prohibition on corresponding with parolees without prior permission. ECF 147-2 at 8-9; ECF 147-3 at 7.

In his response, Mr. Evans concedes Mr. Jones is a pseudonym for Mr. Freed, and explains that "Jones" was Mr. Freed's birth name before his adoption. ECF 158 at 13-14, 17. Mr. Evans again argues he had permission to communicate with Mr. Freed but, as discussed above, there is no evidence Mr. Evans ever received permission to continue communicating with Mr. Freed after he was released on parole. Therefore, the undisputed facts show the defendants properly applied IDOC policy by revoking this email and their enforcement of the rule was not a greater infringement upon Mr. Evans' First Amendment rights than was necessary to protect their legitimate interests in safety, security, and rehabilitation.

Also on December 13, 2022, Mr. Evans attempted to send an email to his sister (Tiffany Freed) with the subject "Hey sis." ECF 147-2 at 9; ECF 139-1. In the content of the message, Mr. Evans stated "they r on some fag shit here with mikey," stated "I need to get

haileys address so I can send mikey his b day card," and requested that Ms. Freed give "hailey" his message. ECF 139-1. This message was revoked by an IDOC employee (Chris Puetzer) for "[a]ttempting to make contact through a third party that is unauthorized per policy," as Mr. Evans was attempting to contact Mr. Freed who was a parolee. *Id.* Mr. Evans submitted a grievance complaining that both the emails he sent to his brother and sister on December 13 were revoked, which the Grievance Specialist rejected as duplicative of Grievance 149812. ECF 52-1 at 171-72; ECF 147-4 at 9. I&I Analyst Takacs and I&I Analyst White attest the second December 13 email was properly revoked because it can be reasonably interpreted as another attempt to contact Mr. Freed through a third party, which violates the Tablets and Kiosks Facility Directive's prohibition on communicating via a third party and the Correspondence Policy's prohibition on contacting a parolee without permission. ECF 147-2 at 9-10; ECF 147-3 at 8.

In his response, Mr. Evans argues "no policy was violated" as "White and Takacs make claims that the policy does not state." ECF 158 at 15. But the policies do expressly state that Mr. Evans may not contact a parolee without prior permission and may not use "other individuals to forward their mail" to circumvent the requirements of incoming and outgoing correspondence. *See* ECF 147-2 at 21, 31. Because the second December 13 email can be reasonably interpreted as a violation of both policies, which protected legitimate interests in safety, security, and rehabilitation, enforcement of the rule was not a greater infringement upon Mr. Evans' First Amendment rights than was necessary.

3. *January 2023 Emails to Floyd Idle.*

On January 9, 2023, Mr. Evans attempted to send an email to his father-in-law, Mr. Idle, with the subject of "RE: son." ECF 52-1 at 3; ECF 139-2; ECF 147-2 at 10. The message asked Mr. Idle to contact the warden, and Mr. Evans concluded the message with the statement, "Kkk ur son..!!!(o)(o)." ECF 139-2.[1] The email was processed by Gregory Denhart and revoked because it violated Section XIV of the Correspondence Policy, as Mr. Evans' statement at the end of the message could reasonably be interpreted to include an obvious and known reference to a Security Threat Group (STG). ECF 147-2 at 10-11, 34 (providing that "Correspondence in direct violation of Security Threat Group rules or the safety and security of the facility shall be censored").

Mr. Evans attempted to send another email to Mr. Idle on January 12 with the same subject and ending with the phrase "Have a good week kk love u! Ur son." ECF 142-1 at 1; ECF 147-2 at 11, 59; ECF 144-1. This email was revoked for the same reason, with the notation "Notice KKK reference." ECF 144-1. The next day, Mr. Evans attempted to send a third email with the same subject and ending with the phrase "kk I love n miss u dad!!! (o)(o) :)," which was revoked for the same reason. ECF 139-6 at 7.[2] Mr. Evans submitted a grievance

---

[1] According to the defendants' internal communications, they believed Mr. Evans and his brother Mr. Freed were both "confirmed white supremacist affiliated." ECF 139-3 at 5.

[2] It appears Mr. Evans attempted to send a fourth email to Mr. Idle shortly after he sent the January 13 email, but Mr. Evans sent this email to Mr. Idle not from his own account but from the account of an inmate named "Jody Sinclair." ECF 139-6 at 6. Because this email was not sent from Mr. Evans' account, the defendants do not address this email in their summary judgment filings, while Mr. Evans argues this email was wrongly revoked. Because this email was sent by "Jody Sinclair," and not by Mr. Evans, it is unclear whether this email is relevant in this case. In any event, assuming this email was sent by Mr. Evans, it is clear from the record that this email violated prison policy because Mr. Evans sent the email from the account of another inmate. *See* ECF 52-1 at 213 ("An offender may not give another offender his/her PIN," and "the use of another offender's PIN shall be considered

challenging the revocation of the January 9 email, which Grievance Specialist Wallen rejected as duplicative of Grievance 149812. ECF 52-1 at 173-74; ECF 147-4 at 10. I&I Analyst Takacs and I&I Analyst White attest the January 9, January 12, and January 13 emails were properly withheld because they could reasonably be interpreted to include an obvious and known STG reference, which explicitly violated Section XIV of the Correspondence Policy and otherwise represented a threat to the safety and security of the facility. ECF 147-2 at 11-12; ECF 147-3 at 9-10.

In his response, Mr. Evans argues these emails did not include any reference to an STG, but rather "(o)(o)" was only an emoji and "kkk" was a typo for the texting shorthand "kk." ECF 158 at 18-19. But the defendants could have reasonably determined these statements were a reference to an STG in the prison, which subjected the emails to being revoked on safety and security grounds because they encouraged activity that could lead to physical violence, group disruption, or a violation of the STG rules. *See* ECF 147-2 at 34, 40; *Koutnik*, 456 F.3d at 785 (the determination whether correspondence contains gang-related symbolism "is an assessment that prison staff is uniquely suited to make," and the court should "defer to the staff's assessment" that correspondence contains gang symbols.). Even accepting as true that Mr. Evans was not attempting to reference an STG, the January 9, January 12, and January 13 emails can be reasonably interpreted to violate the Correspondence policy and the Tablets and Kiosks Facility Directive. *See* ECF 147-2 at 28 ("Correspondence in direct violation of Security Threat Group rules or the safety and

---

abuse of the calling system and shall result in disciplinary action"). Therefore, to the extent this email is relevant in this case, this undisputed facts show it was properly withheld by the defendants.

12

security of the facility shall be censored"); *id.* at 48 (restricting inmates from using a tablet or kiosk for "Any discussions or displays involving STG"). Their enforcement of the policies was not a greater infringement on Mr. Evans' First Amendment rights than was necessary to protect legitimate interests in safety, security, and rehabilitation.

4. *January 26 Emails.*

Last, on January 26, 2023, Mr. Evans' wife attempted to send two emails to Mr. Evans, both of which contained photographs of a scantily clad woman wearing revealing and mostly see-through clothing. ECF 84; ECF 85; ECF 147-2 at 12. Both emails were withheld. *Id.* Mr. Evans challenged the withholding of these emails in Grievance 154130, which the Grievance Specialist rejected as untimely because it was received by the grievance office more than ten business days after the incident date. ECF 147-4 at 10; ECF 52-1 at 176-77. Mr. Evans was able to appeal the Grievance Specialist's rejection of Grievance 154130, and his appeal was denied by the warden. ECF 147-4 at 11; ECF 52-1 at 178-83. I&I Analysts White and Takacs attest the January 26 emails were properly withheld because they violated the Correspondence Policy and Tablets and Kiosks Facility Directive's prohibitions on communications containing any "sexual gestures" and images of any individual who is "improperly dressed" or who fails to comply with dress and behavior standards outlined in the "Offender Visitation" policy. ECF 147-2 at 12-13, 45, 48; ECF 147-3 at 11.

In his response, Mr. Evans argues these photographs were improperly withheld because they did not contain any nudity, and non-nude photos were allowed under the Correspondence policy. ECF 158 at 21. Mr. Evans is correct that the Correspondence Policy prohibits images featuring "nudity" and defines nudity as "a pictorial depiction where

genitalia or female breasts are exposed." ECF 147-2 at 40. But even assuming these photographs do not violate the Correspondence Policy's prohibition on "nudity," the Correspondence Policy also prohibits an inmate from receiving any picture of a person who is not in compliance with the dress and behavior standards outlined in the "Offender Visitation" policy. *Id.* at 45. Moreover, the Tablets and Kiosks Facility Directive prohibits an inmate from using the GTL system to receive any photographs or emails that (1) make any sexual gestures of any kind; (2) include any individual who is improperly dressed; or (3) fail to comply with the dress and behavior standards outlined in the "Offender Visitation" Policy. ECF 147-2 at 48. Enforcement of these policies was not a greater infringement on Mr. Evans' First Amendment rights than was necessary to protect legitimate interests in safety, security, and rehabilitation.

Accordingly, no reasonable jury could conclude I&I Analysts White and Takacs violated Mr. Evans' First Amendment rights by revoking or censoring any of these emails. Summary judgment is warranted in favor of I&I Analysts White and Takacs on this claim.

B. *Due Process Claim against Grievance Specialist Wallen.*

Mr. Evans proceeds against Grievance Specialist Wallen "in his personal capacity for monetary damages for allegedly denying him due process protections in connection with the confiscation of his correspondence[.]" ECF 16 at 6. Specifically, Mr. Evans alleged in his complaint that Grievance Specialist Wallen violated his due process rights by failing to adequately investigate his grievances related to the withholding and censoring of his emails. *Id.* at 3.

14

"Due process requires that the decision to censor inmate mail must be accompanied by minimum procedural safeguards." *Miller v. Downey*, 915 F.3d 460, 465–66 (7th Cir. 2019) (citations omitted). "This standard has generally required officials to provide inmates with notice and an opportunity to object to a confiscation of their mail." *Id.*

Here, it is undisputed Mr. Evans received notice each time his emails were revoked or censored. Moreover, the undisputed facts show Mr. Evans was able to object to the censorship or revocation of each of his emails by filing grievances. Specifically, for his November 22 email, Mr. Evans was able to challenge the censorship of this email in Grievance 148231, which Grievance Specialist Wallen denied on its merits and Mr. Evans was able to fully appeal. ECF 52-1 at 138-39, 148. For his first December 13 email, Mr. Evans challenged the revocation of this email by submitting Grievance 149812, which Grievance Specialist Wallen denied on its merits and Mr. Evans was able to appeal to the warden. ECF 52-1 at 160-61, 166. For the second December 13 email, Mr. Evans challenged the revocation of this email in a grievance complaining that *both* of his December 13 emails were improperly revoked, which Grievance Specialist Wallen rejected as duplicative of Grievance 149812. ECF 52-1 at 171-72. Mr. Evans could have revised and resubmitted this grievance to remove the references to his first December 13 email and differentiate it from Grievance 149812, but he did not do so. *See id.* at 171 (informing Mr. Evans he could "correct the problems listed above" and "re-submit [the] form within five (5) business days").

For his January 9 email, Mr. Evans submitted a grievance challenging the revocation of this email, which Grievance Specialist Wallen rejected as duplicative of Grievance 149812. ECF 52-1 at 173-74. Though the rejection of this grievance may have been erroneous, Mr.

Evans could have revised and resubmitted this grievance to clarify it was not duplicative, but he did not do so. For his January 12 and January 13 emails, there is no evidence Mr. Evans ever submitted any grievance related to these emails, and he does not allege or provide any evidence he was prevented from doing so. And for his January 26 emails, Mr. Evans challenged the withholding of these emails in Grievance 154130, which Grievance Specialist Wallen rejected as untimely but nonetheless allowed Mr. Evans to appeal to the Warden. ECF 52-1 at 176-83.

In his response, Mr. Evans argues Grievance Specialist Wallen sometimes delayed in registering his grievances and did not always file and respond to his grievances within ten business days. ECF 151-2 at 11-13; ECF 157-1 at 12, 24. Though it is true Grievance Specialist Wallen sometimes delayed several weeks in registering or responding to Mr. Evans' grievances, this did not deny Mr. Evans the "minimal procedural safeguards" required by due process, as it is undisputed Grievance Specialist Wallen eventually registered and responded to each of Mr. Evans' grievances. Mr. Evans also argues that Grievance Specialist Wallen violated his due process rights by discussing the censorship decisions with I&I Analysts White and Takacs, as they were the individuals who made the censorship decisions. ECF 151-1 at 15-16; ECF 151-7 at 21-23. An inmate's grievances about censorship should be handled by a prison official other than the person who originally disapproved the correspondence. *See Procunier v. Martinez*, 416 U.S. 396 (1974). Grievance Specialist Wallen complied with this standard, as he handled the investigations into Mr. Evans' grievances and he was not the person who originally censored and withheld the emails. The mere fact that Grievance Specialist Wallen requested information from I&I Analysts White and Takacs

16

while conducting his investigations does not show any due process violation. *See* ECF 52-1 at 40 ("Any staff person directly involved in the situation giving rise to an offender's complaint or grievance shall not participate in the investigation or resolution of the complaint or grievance *other than to provide necessary information during the investigation*") (emphasis added).

The undisputed facts show Grievance Specialist Wallen provided Mr. Evans with the required "minimal procedural safeguards" in handling and responding to his grievances. Mr. Evans was given notice and an opportunity to object each time one of his emails were withheld or censored. *See Miller*, 915 F.3d at 465–66. The fact that Grievance Specialist Wallen may have caused minor delays or made some erroneous determinations in responding to Mr. Evans' grievances does not amount to a due process violation. Summary judgment is warranted in favor of Grievance Specialist Wallen on this claim.

C. *First Amendment Retaliation Claim against I&I Analyst White, I&I Analyst Takacs, and Grievance Specialist Wallen.*

Mr. Evans is proceeding against I&I Analyst White, I&I Analyst Takacs, and Grievance Specialist Wallen "in their personal capacity for monetary damages for allegedly retaliating against him in violation of the First Amendment for filing a prior lawsuit[.]" ECF 16 at 6. To prevail on a First Amendment retaliation claim, Mr. Evans must show "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was 'at least a motivating factor' in the Defendants' decision to take the retaliatory action." *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). To show causation, Mr. Evans must show "a causal link between the protected act and the alleged retaliation." *Woodruff v.*

*Mason*, 542 F.3d 545, 551 (7th Cir. 2008) (quotations omitted). Once Mr. Evans makes this showing, "[t]he burden then shifts to the defendants to show that they would have taken the action despite the bad motive." *Mays v. Springborn*, 575 F.3d 643, 650 (7th Cir. 2009). If the defendants carry this burden, Mr. Evans may still reach trial by showing that the defendant's reasons were merely pretextual. *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 670 (7th Cir. 2009).

In his complaint, Mr. Evans alleged the defendants retaliated against him for filing his grievances and earlier lawsuit in four ways: (1) improperly censoring and withholding his emails; (2) transferring him to a different prison; (3) mishandling his grievances so he could not exhaust his remedies; and (4) blocking him from contacting family members. Each claim will be addressed in turn.

Regarding Mr. Evans' claim the defendants retaliated against him by improperly censoring and withholding his emails, the undisputed facts show the defendants properly applied ISP policy in censoring and withholding each of Mr. Evans' emails. Therefore, because the undisputed facts show the defendants would have withheld these emails regardless of any retaliatory motive, and there is no evidence the defendants' reasons for confiscating the emails were "merely pretextual," summary judgment is warranted in favor of the defendants on this claim.

Regarding Mr. Evans' claim the defendants retaliated against him by transferring him to a different prison, the defendants provide evidence showing certain key facts. Starting in March 2022, Central Office requested Warden Neal to review and provide the names of all inmates who had been in protective custody for over five consecutive years at

ISP for a possible transfer or placement in a step-down unit. ECF 52-1 at 228-30; ECF 147-1 at 5. This information was provided, and Mr. Evans was listed as an inmate who met this criteria. ECF 52-1 at 230; ECF 147-1 at 6. On July 26, 2022, Central Office conducted a protective custody review of all inmates, including Mr. Evans, who met the criteria of being housed in protective custody housing for over five consecutive years. ECF 52-1 at 234-35; ECF 147-1 at 6. Central Office concluded that if Mr. Evans did not want to leave protective custody housing he should be transferred to New Castle Correctional Facility (NCF). ECF 52-1 at 234; ECF 147-1 at 6. Mr. Evans subsequently indicated he did not want to leave protective custody housing and a transfer to NCF was initiated per the results of the Central Office review. ECF 52-1 at 224-27; ECF 147-1 at 6. While Mr. Evans' review was pending final approval, Mr. Evans' attorney in an unrelated case communicated his desire that Mr. Evans remain at ISP, and the decision was made to keep Mr. Evans at ISP until that case was resolved. ECF 147-1 at 6. In January 2023, Central Office approved Mr. Evans' transfer to NCF, and he was transferred one month later once there was no longer any objection from his attorney. ECF 52-1 at 223; ECF 147-1 at 6.

In his response, Mr. Evans does not dispute any of these facts. Therefore, the undisputed evidence shows Mr. Evans would have been transferred to NCF regardless of any retaliatory motive. Mr. Evans argues "the transfer to NCF was for the benefit of the defendants and to cause disruptions to plaintiffs lawsuit, job, visiting, and living arrangements" (ECF 158 at 22), but he cites no evidence in support of this argument, and his vague assertion that the defendants had a retaliatory motive is insufficient to create any genuine triable issue or to show the defendants' valid reasons for transferring him were

19

"merely pretextual." *See Gabrielle M. v. Park Forest-Chicago Heights, IL. Sch. Dist. 163*, 315 F.3d 817, 822 (7th Cir. 2003) ("It is well established that in order to withstand summary judgment, the non-movant must allege specific facts creating a genuine issue for trial and may not rely on vague, conclusory allegations").

Moreover, a prison transfer can constitute an adverse action for First Amendment purposes only if it results in "serious changes of circumstance that would likely deter a person of ordinary firmness from continuing to engage in protected activity." *Holleman v. Zatecky*, 951 F.3d 873, 881 (7th Cir. 2020). For example, the court of appeals has held transfer decisions to be retaliatory when the transfer (1) kept the plaintiff in a life-threatening housing situation, (2) moved the plaintiff from general population into segregated housing with substantial restrictions on his freedom, and (3) moved the plaintiff from a minimum-security facility to a maximum-security facility. *Id.* Conversely, in *Holleman*, the court of appeals held that transferring an inmate from the general population of one maximum-security facility to the general population of another maximum-security facility did not constitute an adverse action when it resulted in only minor changes to the inmate's circumstances, including less law library time, being made to share a cell, and having to witness more violence. *Id.*

Here, there is no evidence by which a reasonable jury could conclude that the attempt to transfer Mr. Evans from ISP to NCF constituted an adverse action that would likely deter First Amendment activity in the future, as the record contains no evidence the transfer subjected Mr. Evans to any "serious change of circumstances" within the meaning of *Holleman.* Accordingly, because (1) his transfer to NCF was not an adverse action, and (2)

20

the defendants have provided undisputed evidence they would have transferred Mr. Evans regardless of any retaliatory motive, summary judgment is warranted in favor of the defendants on this claim.

Regarding Mr. Evans' claim the defendants retaliated against him by mishandling his grievances so he could not exhaust his remedies, the undisputed facts show Mr. Evans was able to submit grievances related to each of his withheld and censored emails. Grievance Specialist Wallen did reject one of Mr. Evans' grievances as untimely, but it is undisputed he allowed Mr. Evans to appeal that determination to the Warden and thereby enabled him to fully exhaust that grievance. ECF 147-4 at 10-11; ECF 52-1 at 176-83. And while Grievance Specialist Wallen may have erroneously rejected Mr. Evans' grievance challenging the revocation of his January 9 email as duplicative, Mr. Evans had the option to revise and resubmit this grievance to clarify that it was not duplicative, and he chose not to do so. *See* ECF 52-1 at 173; ECF 147-4 at 10. It is undisputed that the defendants withdrew their exhaustion defense in this case, and none of Mr. Evans' claims was dismissed for failure to exhaust. *See* ECF 31. Therefore, Grievance Specialist Wallen's handling of Mr. Evans' grievances did not cause Mr. Evans to suffer any deprivation that would likely deter First Amendment activity in the future. Summary judgment is warranted in favor of the defendants on this claim.

Regarding Mr. Evans' claim that the defendants retaliated against him by blocking him from contacting family members, it cannot withstand summary judgment. In connection with the investigation into the censored telephone number within the November 22 email that Mr. Evans sent to his brother Mr. Freed, I&I Analyst Takacs obtained evidence

which indicated the censored telephone number (which Mr. Evans claimed belonged to his father-in-law) was in fact an unconfirmed telephone number because it was associated with numerous names on numerous inmates' telephone lists. ECF 52-1 at 149-56; ECF 139-3 at 1-6; ECF 147-3 at 12. On December 8, 2022, I&I Analyst Takacs emailed Warden Neal regarding the results of his investigation into the censored telephone number, noted that the censored telephone number belonged to two different names on three different inmates' PAN lists, and inquired as to whether Warden Neal recommended blocking Mr. Evans from contacting both (1) the unconfirmed telephone number and (2) his brother Mr. Freed absent prior approval. ECF 52-1 at 220; ECF 139-6 at 1; ECF 147-3 at 12. Warden Neal responded that he recommended blocking Mr. Evans from contacting both Mr. Freed and the unconfirmed telephone number, and both were subsequently blocked. *Id.* Accordingly, starting on December 8, Mr. Evans was blocked from contacting Mr. Freed due to failing to get prior approval to do so, and was blocked from contacting the unconfirmed telephone number included in the November 22 email because that number was "listed as multiple users with the same number for multiple offenders," which violated user privileges. ECF 139-5 at 2; ECF 147-2 at 14-15; ECF 147-3 at 13. I&I Analyst Takacs then discovered evidence that Mr. Evans had tried using the PIN of another inmate to communicate with his father-in-law Mr. Idle. ECF 139-6 at 3-7; ECF 147-1 at 5. I&I Analyst Takacs provided that evidence to Warden Neal, and Warden Neal agreed that I&I Analyst Takacs should remove Mr. Idle from Mr. Evans' telephone list in response. *Id.* Mr. Evans challenged the removal of Mr. Freed and Mr. Idle from his telephone list in Grievance 149136, which Grievance Specialist

22

Wallen denied because the evidence showed Mr. Evans, Mr. Freed, and Mr. Idle had all violated policy. ECF 52-1 at 195-96; ECF 147-4 at 7.

Here, the defendants have provided undisputed evidence showing Mr. Freed and Mr. Idle's phone numbers would have been blocked absent any retaliatory motive because they had reason to believe both phone numbers were violating prison policy. In his response, Mr. Evans argues Mr. Idle's phone number was improperly blocked because Mr. Idle was on his approved telephone list since 2013. ECF 158 at 16-17. But Mr. Evans does not dispute that Mr. Idle's phone number was associated with numerous names on numerous inmates' telephone lists, which the defendants attest violates the Telephone Privileges policy because it represents a safety and security risk to the facility. ECF 147-2 at 14; ECF 52-1 at 212 ("The Facility Head or designee may deny the placement of any telephone number on an offender's telephone list, if it is determined that there is a threat to facility safety or security or to the safety of the public"). Mr. Evans argues he knows of other individuals who use different names on different inmates' telephone lists, but that does not put into dispute the defendants' attestations that such conduct violates the Telephone Privileges policy. Moreover, Mr. Evans does not dispute that he attempted to contact Mr. Idle using another inmate's PIN, which likewise violated the Telephone Privileges Policy. *See* ECF 139-6 at 3-7; ECF 52-1 at 213 ("The giving of a PIN or the use of another offender's PIN shall be considered abuse of the calling system and shall result in disciplinary action [including] restrictions on the use of the offender calling system.").

Accordingly, the defendants have provided undisputed evidence that Mr. Freed and Mr. Idle's phone numbers would have been blocked absent any retaliatory motive because

23

both phone numbers were associated with policy violations. In his response, Mr. Evans does not provide any evidence these reasons were "merely pretextual." Therefore, because the undisputed facts show the defendants would have blocked these phone numbers regardless of any retaliatory motive, summary judgment is warranted in favor of the defendants on this claim.

Accordingly, Mr. Evans has not shown the defendants retaliated against him in violation of his First Amendment rights, as the undisputed evidence shows that for each of the adverse actions alleged by Mr. Evans, either the action was not "adverse" within the meaning of the First Amendment or the defendants would have taken the action absent any retaliatory motive. Summary judgment is warranted in favor of the defendants on Mr. Evans' First Amendment retaliation claim.

D.  *First Amendment Retaliation Claim against Warden Neal.*

Mr. Evans proceeds "against Warden Ron Neal in his personal capacity for monetary damages for allegedly approving of retaliatory conduct by his subordinates in violation of the First Amendment[.]" ECF 16 at 6. No reasonable jury could conclude Warden Neal's subordinates engaged in any retaliatory conduct that violated Mr. Evans' First Amendment rights. Therefore, no reasonable jury could conclude Warden Neal violated Mr. Evans' First Amendment rights by approving of his subordinates' conduct. Summary judgment is warranted in favor of Warden Neal on this claim.

For these reasons, the court:

(1) GRANTS the defendants' motion for summary judgment (ECF 147);

(2) DENIES Mr. Evans' motion for summary judgment (ECF 151); and

24

(3) DIRECTS the clerk to enter judgment in favor of the defendants and against Robert Evans and to close this case.

SO ORDERED.

March 26, 2026                                    s/ Damon R. Leichty
                                                 Judge, United States District Court

25